UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| MICHAEL McNALLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 6:18-CV-16-REW-HAI |
| v. | ) | |
| | ) | |
| JAMES TABOR, individually and in his | ) | |
| official capacity as Deputy, Whitley County | ) | |
| Sheriff Department, | ) | |
| | ) | OPINION AND ORDER |
| and | ) | |
| | ) | |
| COLAN HARRELL, individually and in his | ) | |
| official capacity as Sheriff, Whitley County | ) | |
| Sheriff Department, | ) | |
| | ) | |
| Defendants. | | |

**\*\*\* \*\*\* \*\*\* \*\*\***

## I.     BACKGROUND

This lawsuit centers on the roadside seizure of Plaintiff Michael McNally, who claims to have suffered a fractured arm while Defendant Whitley County Sheriff's Deputy James Tabor effected McNally's arrest by force. Tabor charged McNally with a series of offenses, including driving under the influence. At trial, the Whitley District Judge entered a directed verdict in McNally's favor based on a discovery violation, the Commonwealth's failure before trial to identify all officers at the scene of McNally's arrest. Shortly after, McNally sued both Tabor and Whitley County Sheriff Colan Harrell under § 1983 for violations of his constitutional rights and under state law for malicious prosecution, battery, and negligence/gross negligence.

Only Tabor and McNally were present for the key events, and the parties agree about some of what happened on the night of McNally's arrest.[1] On April 14, 2017, around 9:00 p.m., both McNally and Tabor were driving in Whitley County on U.S. Highway 25. It was dark. The truck that McNally was driving—apparently not his own—did not have its headlamps illuminated, so Tabor initiated a traffic stop. When McNally got out of the truck, it rolled away and struck a guardrail. McNally reentered the vehicle to put it in park. Tabor detected the odor of alcohol as he approached McNally. Tabor asked McNally whether he had weapons in his possession, and McNally handed over his pocket-knife. When Tabor asked McNally for his license and proof of insurance, McNally produced his license but not proof of insurance. Throughout the interaction, Tabor ordered McNally multiple times to keep his hands out of his pockets. McNally still tried to fish his cigarette lighter from a pocket. At some point while McNally was standing outside the truck, McNally, with no notice, moved to reach inside the vehicle, and Tabor brought him to the ground and handcuffed him. Tabor then requested backup and put McNally into his police cruiser, advising McNally that he was under arrest for driving under the influence, menacing, no insurance, and no headlamps. Tabor drove McNally to the hospital for a blood test to determine his potential impairment, but McNally claimed not to understand the implied consent notice that Tabor read to him, so Tabor took him to the detention center instead. McNally never asked to be taken to the hospital for an injury. Upon his release, McNally sought medical treatment and was diagnosed with a broken arm.

Other facts are disputed or at least unclear in light of the parties' competing accounts. According to Tabor, McNally's truck struck the guardrail multiple times—both in the process of

---

[1] The Court summarizes from the depositions of McNally (DE 30) and Tabor (DE 31). McNally's version is largely at DE 30 pages 12–30 and Tabor's at DE 31 pages 48–70.

the initial stop, and again after McNally got out of the vehicle. DE 31 at 50. Tabor states that McNally denied having been drinking. Also, Tabor characterizes McNally as argumentative during the stop; McNally continued to reach his hands into his pockets despite Tabor's repeated instructions to the contrary. In response to Tabor's question about McNally's license and insurance, McNally advised that, because the truck belonged to someone else, he did not have proof of insurance. Tabor viewed McNally's "abrupt movement" toward the interior of the truck as a potential attempt to flee or obtain a weapon from inside the vehicle.

In McNally's version, the truck struck the guardrail only once, and McNally tried (perhaps unsuccessfully) to explain the cause to Tabor: a mechanical issue with the transmission and lack of dashboard lights (to enable the driver to see what gear the truck was in). Per McNally, he did not actually put his hands in his pockets, but he did ask Tabor whether he could smoke a cigarette and whether Tabor wanted to take the lighter that was in McNally's "watch fob pocket," supposedly visible to Tabor. McNally admits that he was leaning into the truck's passenger compartment to continue to look for proof of insurance before Tabor grabbed him and took him to the ground. McNally concedes that, even after being told not to reach into his pockets, he tried, with no permission from Tabor, to retrieve his lighter from a front pocket. This was just as McNally had abruptly reached into the truck and just prior to the takedown. *See* DE 30 at 21; *id.* at 13 ("[H]e's like 'Get your hands out of your pockets' and I said, 'Sir, I just want the lighter.'").

Before the Court is Defendants' amended motion seeking summary judgment on all claims (DE 40-1). McNally responded in opposition. DE 44. Defendants replied. DE 45.

## II.     STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106 S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

## III. ANALYSIS

A fair reading of McNally's complaint yields a slew of distinct theories of recovery. McNally appears to assert each of the complaint's five counts—§ 1983 unlawful seizure/false arrest, § 1983 excessive force, state-law malicious prosecution, state-law battery, and state-law negligence/gross negligence—against both Tabor and Harrell in their individual and official capacities. *See* DE 1 ¶ 5 ("Plaintiff sues Defendants Harrell and Tabor in their official and individual capacities."). In effect, this duplication exists for all counts except the two § 1983 official-capacity claims, which do not require individualized treatment as to each Defendant.

The analysis proceeds in two steps. First, the Court culls McNally's catalog of claims. Of the numerous claims that McNally appears to bring against Tabor and Harrell, nine require only brief discussion. Second, the Court considers the remaining issues, taking the § 1983 and state-law claims in turn, and concludes that none of McNally's claims survives summary judgment.

### A. Preliminary Matters

#### 1. Individual-Capacity § 1983 Claims Against Harrell

It is not entirely clear whether McNally seeks to recover from Harrell in his individual capacity under § 1983. *See* DE 1 ¶ 5. In Count I, McNally alleges unconstitutional behavior by *Defendants*—emphasis on the plural—and in Count II, McNally likewise demands judgment against *Defendants*. *See* DE 1 ¶¶ 53–54, 62. Defendants argue that there is no evidence that Harrell knew about Tabor's supposedly unconstitutional conduct, and it is uncontested that Harrell was not present (or otherwise directly involved) during McNally's arrest. *See* DE 32 at 41 (Harrell Deposition); DE 40-1 at 28. In response to Defendants' briefing, McNally focuses not on particular acts by Harrell but on perceived deficits in county policy regarding deputies.[2] *See* DE 44 at 9–15.

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985). "Where a supervisor is also a policymaker, it may be easy to 'improperly conflate[] a § 1983 claim of individual supervisor liability with one of municipal liability' or an official-capacity claim." *Horn v. City of Covington*, No. 14-73-DLB-CJS, 2018 WL 3865377, at *32 (E.D. Ky. Aug. 14, 2018) (quoting *Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008)). But "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee v Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation omitted). "A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At

---

[2] McNally's repeated references to *City of Canton v. Harris*, 109 S. Ct. 1197 (1989) and *Connick v. Thompson*, 131 S. Ct. 1350 (2011) further indicate that McNally's § 1983 theory as to Harrell is most fairly viewed as one of municipal, rather than individual, liability. *See* DE 44 at 9–15. Both *Harris* and *Connick* also involved official-capacity claims. *Connick*, 131 S. Ct. at 1355–56; *Harris*, 109 S. Ct at 1200.

a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Phillips*, 534 F.3d at 543 (quoting *Shehee*, 199 F.3d at 300).

Given the equivocal complaint—evidently asserting all counts against both Defendants in both capacities—and McNally's failure to suggest a triable issue on Harrell's actual involvement in McNally's arrest, the Court declines to entertain an individual-capacity § 1983 claim against Harrell. McNally's allegations sound in an official-capacity theory (which the Court addresses below). Moreover, McNally did not respond to Defendants' relevant arguments based on Harrell's lack of involvement and qualified immunity. *See* DE 40 at 28; DE 44 at 9–15. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). For these reasons, to the extent McNally brings an individual-capacity § 1983 claim against Harrell, summary judgment in favor of Defendants is warranted.

### 2. Official-Capacity State-Law Claims Against Harrell

McNally argues three state-law claims against Harrell: malicious prosecution (Count III), battery (Count IV), and negligence/gross negligence (Count V). Defendants invoke sovereign immunity as a defense to all official-capacity state-law claims. DE 40-1 at 18.

Sovereign immunity clearly dooms the official-capacity theory regarding Harrell's own conduct. "Official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Commonwealth Bd. of Claims v. Harris*, 59 S.W.3d 896, 899 (2001) (quoting *Graham*, 105 S. Ct. at 3105). "Because the county is a political subdivision of the state, it is 'cloaked' with sovereign or governmental immunity." *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). Sheriffs, as county officials, would have absolute immunity from

suit for both their torts and their deputies' torts. *Id.* But a state may waive this immunity, and the *Jones* court interpreted KRS 70.040 to constitute a partial waiver. *See id.* at 345–46. A plaintiff may sue the sheriff's office "for the tortious acts or omissions" of a sheriff's deputies but not for the acts or omissions of the sheriff himself. *Id.* Sovereign immunity therefore bars the three official-capacity state-law claims against Harrell (for his own conduct) but does not foreclose Tabor's individual liability or the office's (i.e., Harrell's official, vicarious) liability for Tabor's tortious acts or omissions.

### 3. Individual-Capacity State-Law Claims Against Harrell (Respondeat Superior)

According to Counts III, IV, and V, Harrell is liable for Tabor's alleged battery, malicious prosecution, and negligence "under the doctrine of *respondeat superior*." DE 1 ¶¶ 68, 74, 84. Other than urging that the claim fails, Defendants say little about McNally's theory. *See* DE 40-1 at 30, 32. And, aside from the unhelpfully broad assertion in the complaint, *see* DE 1 ¶ 5, McNally does not further identify the actor for whom Tabor's conduct creates liability: Harrell in his individual capacity, Harrell in his official capacity (in effect, the county), or both. Nonetheless, the Court construes the complaint to allege, at least in part, that Harrell is personally liable for Tabor's supposed battery, malicious prosecution, and negligence.

Under Kentucky law, "[a]n *employer* is strictly liable for damages resulting from the tortious acts of his employees committed within the scope of his employment." *Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 792–93 (Ky. 2011) (emphasis added). Harrell, in his individual capacity, cannot be vicariously liable for Tabor's torts unless Harrell was Tabor's employer. *See Lamb v. Interstate S.S. Co.*, 149 F.2d 914, 917 (6th Cir. 1945) ("While the general rule is that the master is liable for the acts of his employees done within the scope of their employment, it is equally well settled that the rule applies only when the relation of master and servant is shown to

8

exist between the wrongdoer and the person sought to be charged for the wrong at the time of the injury and with reference to the very transaction out of which the injury arose; otherwise, the doctrine of respondeat superior does not apply.") At the time of this incident, the Whitley County Sheriff's Department, not Harrell personally, was Tabor's employer. Therefore, to the extent McNally asserts individual-capacity state-law claims against Harrell on a respondeat superior theory, those claims do not survive summary judgment.

### 4. State-Law Negligence/Gross Negligence Claim Regarding Tabor's Conduct

McNally alleges that Tabor breached his duty of care "with respect to the arrest, use of force and prosecution of Plaintiff." DE 1 ¶ 79. Defendants contend that qualified official immunity protects them from liability and that Count V fails on the merits anyway because McNally cannot prove breach, offered no expert opinion on the standard of care, and identified no malice or willfulness (for purposes of gross negligence). DE 40-1 at 20–22, 32–35.

This claim is bothersomely imprecise. A Kentucky negligence claim requires proof of a duty owed to the plaintiff, a breach by the defendant, and "consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). Though McNally never identifies the source of Tabor's supposed duty to McNally, *see* DE 1 ¶¶ 77–79, Defendants appear to concede that a duty exists— observing the "universal duty of care," *see* DE 40-1 at 32—and instead focus their argument on the need for expert testimony as to the applicable standard of care, *see* DE 40-1 at 32–33. As for gross negligence, Kentucky law requires two findings: a failure to exercise reasonable care, "accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013) (internal citation omitted). On this theory, McNally offers scant factual support, only the bare assertion that Defendants "exercised little to no care, and were grossly negligent." *See* DE 1 ¶ 83. Defendants maintain that the existence of

probable cause and the reasonableness of Tabor's use of force—latterly discussed issues relevant to the § 1983 and other state-law claims—likewise resolve the negligence claim in their favor. DE 40-1 at 33.

The Court perceives a different problem with the negligence count. Namely, an "officer is liable for the intentional tort of battery, not for negligence, when he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee." *Ali v. City of Louisville*, No. 3:03CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006) ("To permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence."). Kentucky courts have recognized that there is no such creature as negligent assault, *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 732–33 (Ky. 2009), and this reasoning applies with similar force to the intentional torts of which McNally complains. *See also District of Columbia v. Chinn*, 839 A.2d 701, 706–10 (D.C. 2003) (discussing invalidity of negligent assault). No amount of vague pleading can transform false-arrest or malicious-prosecution claims into causes of action properly sounding in negligence. *See Jones v. Clark Cty.*, No. 5:15-337-DCR, 2016 WL 4146119, at *9 (E.D. Ky. Aug. 3, 2016) (discussing false arrest and malicious prosecution); *Lewis v. Laurel Cty. Sheriff's Dep't*, No. 09-280-GFVT, 2011 WL 3475370, at *6 (E.D. Ky. Aug. 8, 2011) (explaining this concept as it applies to malicious prosecution).

As to Tabor, McNally relies on the same conduct that forms the basis of his constitutional and state-law claims and attempts to repackage the allegations as a negligence/gross-negligence count. This strategy may have been permissible if McNally had set forth an independent theory that met the requirements of a negligence or gross-negligence claim under Kentucky law. To the extent McNally asserts that Tabor *negligently* falsely arrested him, *negligently* used unnecessary

force against him, or *negligently* maliciously prosecuted him, the Court rejects the effort and finds no possible personal liability for Tabor on Count V.

Under KRS 70.040 (as interpreted in *Jones*), the sheriff's office may have vicarious liability for Tabor's negligence. But, because the individual-capacity negligence count against Tabor needlessly duplicates Counts III and IV and fails as a matter of law, Harrell—really, the office or county—can have no official-capacity liability on this count. *See Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007) ("[V]icarious liability is not possible without primary liability.").[3] Accordingly, McNally cannot prevail on Count V against Tabor on the individual-capacity theory or against Harrell on the official-capacity theory.

### 5. Summary

Here's what remains: two individual-capacity § 1983 claims against Tabor; two official-capacity § 1983 claims, effectively against the office; state-law causes of action for malicious prosecution and battery against Tabor in his individual capacity and against Harrell in his official capacity (vicariously, for Tabor's conduct); and a state-law negligence claim against Harrell in his individual capacity.

### B. Section 1983 (Counts I and II)

"Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (citing 42 U.S.C. § 1983).

---

[3] The complaint appears to contain two independent negligence theories as to Harrell: negligent hiring, retention, training, and supervision, and respondeat superior liability for Tabor's negligence. *See* DE 1 ¶¶ 80–82, 84. The Court addresses the first theory below. For the reasons explained above, the second theory is meritless; Harrell was not Tabor's employer, and neither Harrell nor the county can have any vicarious liability without Tabor's primary liability for his own negligence.

### 1.  Individual-Capacity Claim Against Tabor

The complaint alleges two § 1983 counts against Tabor: unlawful seizure/false arrest (Count I) and excessive force (Count II). *See* DE 1. There is no dispute that Tabor was acting under color of state law, so the pertinent question is whether Tabor violated McNally's constitutional rights. Counts I and II both implicate McNally's Fourth Amendment rights, but the theories are distinct. Count I's viability depends on whether Tabor had probable cause to arrest McNally. Count II prompts an inquiry into the objective reasonableness of Tabor's force in arresting and handcuffing McNally.[4]

#### a.  Probable cause to arrest

Tabor arrested McNally and lodged four charges: no headlamps, no insurance, driving under the influence, and menacing. *See* DE 40-5 (Uniform Citation).

The Fourth Amendment protects against unreasonable searches and seizures, which includes an arrest without probable cause. *Alman v. Reed*, 703 F.3d 887, 896 (6th Cir. 2013). To prove false arrest under § 1983, a plaintiff must show that the officer lacked probable cause. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). In other words, "[a]n arrest is valid so long as there is probable cause for a single charge of an arrestable offense." *Miller v. Sanilac Cty.*, 606 F.3d 240, 248 (6th Cir. 2010). "A police officer has probable cause if there is a 'fair probability' that the individual to be arrested has either committed or intends to commit a crime." *Fridley*, 291

---

[4] The complaint includes due process and equal protection claims alongside references to McNally's Fifth, Eighth, and Fourteenth Amendment rights. *See* DE 1 at 8–9. McNally does not develop these theories, and in any case, the Fourth Amendment is the sole constitutional right applicable to these circumstances. *Albright v. Oliver*, 114 S. Ct. 807, 813 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"); *Davis v. Pickell*, 939 F. Supp. 2d 771, 777 (E.D. Mich. 2013) (clarifying the applicability of the Fourth, Eighth, and Fourteenth Amendments).

F.3d at 872 (internal citation omitted). "To determine whether probable cause exists, [a court] consider[s] only 'the facts known to the arresting officer at the time of the arrest.'" *Hartman v. Thompson*, 931 F.3d 471, 481 (6th Cir. 2019). "Probable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal quotation omitted). "The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003). The analysis is commonsense, not hyper-technical, and objectively accounts for the nuances, particulars, inferences, and details of the situation on the ground at the time of the decision to seize. *See Texas v. Brown*, 103 S. Ct. 1535, 1543 (1983).

### i. No headlamps

The parties agree that McNally was driving at night (around 9:00 p.m. in early spring 2017) without his headlamps illuminated. DE 1 ¶ 14; DE 40-1 at 2; DE 44 at 2. Defendants contend that Tabor's personal observation of the non-illuminated headlamps constitutes probable cause to charge McNally with this offense. DE 40-1 at 25, 29. But, non-compliance with the Kentucky headlamp law, KRS 189.040(4), is punishable only by a fine, KRS 189.990(1). Thus, the conduct is a non-arrestable violation rather than an arrestable misdemeanor. KRS 431.060(3); KRS 431.005(1). Tabor's probable cause as to this offense cannot justify McNally's arrest.

### ii. No insurance

Regardless of whether McNally was driving an uninsured truck at the time, *see* DE 1 ¶ 20, the parties do not appear to dispute that McNally failed to produce proof of insurance upon Tabor's request. *See* DE 40-1 at 30; DE 44 at 3 ("Plaintiff leaned into his vehicle in an attempt to find the vehicles [sic] insurance information."). The determinative question is whether, at the time of the

13

arrest, Tabor had probable cause to believe that McNally had committed the offense of operating an uninsured vehicle.

Kentucky law requires car owners and operators to maintain adequate car insurance, KRS 304.39-090, and the failure to do so may be punished by up to ninety days' imprisonment, KRS 304.99-060(2)(a). The offense therefore constitutes a misdemeanor, KRS 431.060(2), and Kentucky law authorizes peace officers to make warrantless arrests for misdemeanors committed in their presence. KRS 431.005(1)(d). A separate provision imposes a temporally limited obligation upon the vehicle's owner to produce an insurance card upon a peace officer's request. KRS 304.39-117(2). Unlike the failure-to-maintain-insurance statute, the failure-to-produce-insurance-card statute does not impose penalties. *See Kilburn v. Commonwealth*, 2012-SC-494-MR, 2014 WL 1514622, at *5 (Ky. Apr. 17, 2014). Without a specific authorized penalty, the general penalty provision provides only for the imposition of a fine. KRS 304.99-010.

Here, viewing the facts in the light most favorable to McNally, though there was room for doubt about an insurance policy, he never volunteered that the truck was uninsured. Defendants maintain that, on the topic of insurance, McNally "said he didn't know" or that "[h]e didn't have any." DE 31 at 61 (Tabor Deposition). But McNally claims that he "knew [the card] was there somewhere" in the vehicle and that he had advised Tabor of this before the takedown and arrest. DE 30 at 21 (McNally Deposition). Defendants' showing would be stronger if, unlike Kentucky law, a statute had obligated McNally to maintain proof of insurance at all times. *See Schilling v. Swick*, 868 F. Supp. 904, 907–08 (W.D. Mich. 1994) ("Officer Swick also had probable cause to arrest Jeffrey Schilling based upon his failure to provide proof of insurance upon request."). Under these facts, the existence of probable cause is not so obvious so as to justify summary judgment for Defendants (at least not without considering the impact of qualified immunity).

### iii. Driving under the influence

To demonstrate that probable cause did not exist for this charge, McNally challenges Tabor's failure to administer field sobriety tests and points to McNally's lack of bloodshot eyes and slurred speech. DE 44 at 8. McNally further offers alternative characterizations of the facts relied upon by Defendants. *See id.* at 2–3. According to Defendants, probable cause for this charge depends on Tabor's observation of McNally driving without headlamps, the fact that the truck hit the guardrail, the odor of alcohol emanating from McNally, Tabor's repeated commands that McNally keep his hands out of his pockets, McNally's unusual statements comparing Kentucky to Hawaii, and his sudden movement to reach inside the vehicle. DE 40-1 at 25, 29; DE 45 at 2–4.

The Court must view the facts underlying the probable-cause determination from the perspective of an objectively reasonable officer on the scene. *Fox v. DeSoto*, 489 F.3d 227, 235–36 (6th Cir. 2007). "A suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause to arrest exists." *Criss v. Kent*, 867 F.2d 259, 263 (6th Cir. 1988). But, "officers are free to disregard either all innocent explanations, or at least innocent explanations that are inherently or circumstantially implausible." *District of Columbia v. Wesby*, 138 S. Ct. 577, 592 (2018). "[I]nnocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect." *Id.* The Sixth Circuit once found probable cause to exist even when the suspect's unsafe driving may have been influenced by inadequate signage, poor lighting, or the design of a roadway island. *Bailey v. City of Howell*, 643 F. App'x 589, 595–96 (6th Cir. 2016). The undisputed facts in *Bailey* showed that the suspect had driven carelessly, had watery, blood-shot eyes, admitted to drinking, refused to take a breath test, and smelled of alcohol. *Id.*

Here, McNally admits the facts relied upon by Defendants: he was driving at night without headlamps; the truck hit the guardrail; McNally "probably" smelled like alcohol; Tabor repeatedly instructed McNally to keep his hands out of his pockets; McNally made comments about Hawaii or otherwise tried to engage Tabor in small talk during the stop; and McNally moved to reach inside the truck without notice or permission. DE 30 at 12–13, 18–19, 21–23 (McNally Deposition). McNally now provides innocent explanations for certain facts and argues that, as a result, Tabor could not have had probable cause. *See* DE 44 at 2–3, 8. But Tabor need not have credited on-the-scene justifications, if any, *see Wesby*, 138 S. Ct. at 592, and McNally's subjective motivations and post-hoc exculpatory explanations are inapt, since probable cause depends on what a reasonable officer would have perceived *at the time of the arrest*. Based on the undisputed facts described above, no reasonable juror could conclude that Tabor lacked probable cause to arrest McNally for driving under the influence.

Tabor had collected information objectively supporting a belief of probable criminality: McNally drove without lights, which violates Kentucky law and evinces impairment. When McNally exited his truck, the vehicle rolled away and hit the guardrail. This clearly impugned McNally's fitness to drive and signaled concern. Tabor smelled alcohol on McNally's person; Plaintiff concedes that he probably smelled of alcohol. Plaintiff then engaged in, at least, odd conversation. He seemed unable to follow directions, forcing Tabor to repeatedly warn him against reaching into his pockets. Further, critically, McNally tried to enter or reach into his truck in an unexpected, unsanctioned action. McNally had beer in the truck; Tabor specifically noticed beer cans or bottles on the scene. This data set, under the standard, could lead to only one result. Tabor had probable cause to believe that McNally—who drove illegally, smelled of alcohol, and allowed

the unattended vehicle to roll off into a guardrail—had operated his truck "while under the influence of alcohol." KRS 189A.010(1)(b).[5]

### iv. Menacing

McNally argues that he "did not engage in any conduct that could be construed as "Menacing." DE 1 ¶ 21. Defendants assert that probable cause existed to charge McNally with menacing because McNally made an abrupt movement to reach inside his vehicle, which Tabor interpreted as creating "a reasonable safety concern." DE 40-1 at 30.

Under Kentucky law, "[a] person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." KRS 508.050(1). Menacing involves "antagonistic behavior focused at another person," and some of the hallmarks include moving closer, using a raised voice or threatening tone, and making physical contact or gestures. *Martin v. Coyt*, No. 1:10-cv-176-R, 2012 WL 1574823, at *10 (W.D. Ky. May 3, 2012). Other factors include whether a potential aggressor is "armed, intoxicated, or indicating a desire to flee." *Ayala v. Hogsten*, No. 17-47-HRW, 2019 WL 1338391, at *5 (E.D. Ky. Mar. 25, 2019). In one instance, there was probable cause for menacing when a defendant came close to officers, took an aggressive posture, and yelled, even though the defendant may have been raising his hands

---

[5] The Court realizes that probable cause is often a jury question but sees a lone rational result here. However, even if the Court thought probable cause debatable, Tabor surely had sound reasons to perceive adequate cause. This would cloak Tabor in qualified immunity. *See Phillips v. Blair*, No. 18-4043, 2019 WL 4164727, at *5 (6th Cir. Sept. 3, 2019) ("[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful.") (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)). "Qualified immunity is an affirmative defense that, once asserted, shifts the burden of proof to the plaintiff to show that the defendant is not entitled to qualified immunity." *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008). McNally does not address this analysis with any detail or particularity and has not shown that Tabor acted outside the sphere of qualified immunity.

to comply with the officers' directive rather than to take a swing. *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 702–03 (W.D. Ky. 2001).

Here, more than one reasonable determination is possible. It is undisputed that McNally moved unexpectedly to access the passenger compartment of the truck. But, the significance of this action, under the totality of the circumstances, depends on which party's view the factfinder accepts. One might reasonably think that McNally was argumentative and non-compliant and that his abrupt movement was intended to facilitate flight or access to a weapon. One might reasonably think that McNally had tried to comply with Tabor's earlier directives and partially entered the truck only as a response to Tabor's request for proof of insurance. Because probable cause on the menacing charge presents a jury question, summary judgment on this ground would be improper.

In all, though, regardless of Tabor's probable cause to believe that McNally had committed any other arrestable offense, any reasonable juror would conclude that Tabor lawfully arrested McNally for driving under the influence. The status of Tabor's probable cause as to the other three charges is thus irrelevant, and McNally cannot prevail on his individual-capacity § 1983 claim for unlawful seizure/false arrest because no constitutional violation occurred. Tabor had probable cause to arrest McNally, vitiating the foundation for any improper-arrest claim.

### b. Objective reasonableness of Tabor's use of force

McNally argues that Tabor used unreasonable force during the 2017 arrest. DE 1 ¶ 58. Defendants counter that Tabor's use of force was reasonable, in light of Tabor's probable cause to believe that McNally was intoxicated and the standard nature of the arm-bar technique that Tabor used to take McNally to the ground. DE 40-1 at 26–27. Defendants further argue that McNally has failed to establish medical causation of any claimed injury. *Id.* at 27. In response, McNally insists

(albeit in the context of his negligence claim) that the causation of his injury is a matter of "common knowledge." DE 44 at 20–21.

"Whether an officer has exerted excessive force during the course of seizure is determined under an 'objective reasonableness' standard." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009). The Court views the facts from the perspective of an objective officer and in the light most favorable to McNally. *See Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008). Following *Dickerson v. McClellan*, 101 F.3d 1151, 1161–62 (6th Cir. 1996), courts use a segmented approach to assess an officer's conduct during an arrest to ensure that the use of force "at each juncture" was objectively reasonable. *See Hysell v. Thorp*, No. 2:06-cv-170, 2009 WL 262426, at *16 (S.D. Ohio Feb. 2, 2009). Here, the Court discerns two segments: the initial takedown and subsequent handcuffing.

### i. Takedown

To determine whether Tabor's use of force was objectively reasonable at this juncture, "the question is whether the totality of the circumstances justifie[d] the use of an arm-bar takedown." *See Aldrich v. City of Columbus*, No. 2-15-cv-404, 2016 WL 6084570, at *6 (S.D. Ohio Oct. 18, 2016). The inquiry accounts for "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989). "[T]he 'extent of the injury inflicted' is not 'crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment.'" *Morrison*, 583 F.3d at 407.

As to the first factor, the crime at issue may be categorically severe or severe on the particular facts. *Eldridge v. City of Warren*, 533 F. App'x 529, 532–33 (6th Cir. 2013). Driving under the influence is serious but "not categorically 'severe'" for purposes of the excessive-force

inquiry. *Id.* (citing *Begay v. United States*, 128 S. Ct. 1581, 1586–87 (2008)) ("[S]tatutes that forbid driving under the influence . . . typically do not insist on purposeful, violent, and aggressive conduct . . . ."). However, a suspect's intoxication can create the potential for volatility. *Marvin v. City of Taylor*, 509 F.3d 234, 245–46 (6th Cir. 2007).

The second *Graham* factor involves an analysis of safety considerations, including the suspect's compliance with officer directions, freedom of movement, potential access to weapons, and verbal and non-verbal communication. *See Meirthew v. Amore*, 417 F. App'x 494, 497–98 (6th Cir. 2011). Under the third factor, minimal disobedience—such as refusing to spread one's feet for a search or making a crude comment while otherwise compliant and handcuffed—does not constitute active resistance sufficient to justify a substantial use of force. *Burgess v. Fischer*, 735 F.3d 462, 474–75 (6th Cir. 2013); *Meirthew*, 417 F. App'x at 497–98. In contrast, a suspect resists arrest when he fails to place his hands behind his back after being given sufficient time to comply with the order. *Bozung v. Rawson*, 439 F. App'x 513, 520–21 (6th Cir. 2011).

In this case, at least two of the three *Graham* factors weigh in favor of the reasonableness of Tabor's use of force in subduing McNally. The first factor may be somewhat indeterminate. Tabor reasonably suspected that McNally had committed the serious offense of driving under the influence. But, this offense does not inherently involve violence or aggression, and there is no indication that Tabor reasonably perceived McNally to be intoxicated to the point of volatility. The menacing charge does involve the apprehension of imminent injury and weighs in favor of using force, but McNally separately challenges Tabor's basis for charging him with that offense. The Court focuses the inquiry on the remaining factors.

The second factor, based on the threat to officer and public safety, justifies Tabor's use of force. Viewing the facts in the light most favorable to McNally, the two men were engaged in a

nighttime traffic stop on the side of the road, after the truck had rolled into the guardrail during the stop. McNally, smelling of alcohol, had relinquished his knife on Tabor's request. Tabor repeatedly told McNally to keep his hands out of his pockets; McNally still tried to access his pocket for a lighter. Even McNally's version supports an inference of non-compliance, as he acknowledges Tabor's repetition of instructions (which makes little sense in conjunction with McNally's assertion that he complied). Per McNally, when he realized that Tabor was going to write a citation, McNally entered the truck, unbidden, to again try to locate the insurance card. DE 30 at 21. An objectively reasonable officer would have perceived the need to arrest McNally quickly in response to this sudden movement, given the possibility that the truck could enable McNally's flight (while presumably intoxicated) or contain a weapon. Again, there is no dispute that the truck held both beer and a butcher knife on the bench, per Tabor.

The third *Graham* factor likewise supports the reasonableness of Tabor's use of force. McNally, though stopped on the side of the road, was not yet restrained or subdued, and an objectively reasonable officer would have recognized the possibility that McNally could use the truck to flee. McNally's arguable subjective motivation—apparently to comply with Tabor's earlier order to produce an insurance card—is immaterial to the perception of an objectively reasonable officer on the scene.

In sum, Tabor acted reasonably and did not violate McNally's Fourth Amendment right to be free from excessive force when he used an arm-bar technique to effect a valid arrest.

### ii. Handcuffing

 "The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison*, 583 F.3d at 401. "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material

fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Id.* The third prong clearly requires but-for causation between the physical injury and the handcuffing. *See Jones v. Lafferty*, No. 15-51-KKC-CJS, 2018 U.S. Dist. LEXIS 52062, at *22–25 (E.D. Ky. Feb. 12, 2018) (finding summary judgment appropriate when abrasions resulted from resisting arrest, not excessively forceful handcuffing); *Cochran v. Shelby Twp.*, No. 2:13-cv-11756, 2014 WL 4639467, at *7–8 (E.D. Mich. Sept. 16, 2014) (granting summary judgment for defendant officers in part based on plaintiff's admission that the tightness of handcuffs had not caused physical injury).

Here, McNally loses on the third prong, as he has not created a triable issue regarding whether his only identified injury—a fractured ulna—resulted from Tabor's excessively forceful handcuffing. McNally does allege that the handcuffs were too tight. *See* DE 30 at 13, 22 (McNally Deposition); DE 44 at 21. He also claims that Tabor ignored his request to loosen the handcuffs and that Tabor apparently stopped another unidentified officer—who had already loosened the left handcuff—from heeding McNally's request. DE 30 at 13. But Plaintiff never alleges, in his complaint, deposition, or briefing, that Tabor's excessively forceful handcuffing caused McNally's broken ulna.[6] To the contrary, in his deposition, McNally conceded that he suffered an injury during the "takedown." *Id.* at 23. Later, in response to a question about "what Officer Tabor did physically to cause injury to [his] wrist," McNally opined on several subjects, including the lack of necessity for Tabor to have taken him to the ground, handcuffed him, or "jerk[ed] [him]

---

[6] Nor does McNally respond to the contention of Rob Miller, Defendants' police-practices expert, who opined in his report that, during his almost forty years of experience, he had never "witnessed a fracture caused by handcuffing." DE 40-2 at 6. Plaintiff has no expert on medical causation.

around," and concluded with an observation about Tabor's attitude. *Id.* Viewing the facts in the light most favorable to McNally, it is fair to assume that (if related to this case) he suffered a broken arm as a result of the takedown that preceded his arrest. But under *Morrison*, McNally bears the burden to demonstrate "'some physical injury' *resulting from the handcuffing*." *Morrison*, 583 F.3d at 401 (emphasis added). This, McNally has not done. *See also* DE 1, Introduction (attributing wrist injury to claim that "Tabor . . . manhandled" him).

### c. Qualified Immunity

"Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). A plaintiff who seeks to recover from a government official purportedly protected by qualified immunity must therefore make two showings: first, that the plaintiff's constitutional rights were violated in the first place; and second, that the right was clearly established at the time of the actor's alleged misconduct. *Id.*

The Court already has found no jury question on the issue of a constitutional violation. Plaintiff makes no effort to discuss the qualified immunity principles that otherwise might impact the case. Rather, McNally spends much of his brief repeating that probable cause typically is a jury question. Further, he has a lengthy discussion, not based on proof or an expert in this case, on the topic of Tabor's hypervigilance. What Plaintiff does not do is marshal the qualified-immunity rubric. Finding no predicate violations, the Court, except as earlier noted, elects against deep study of a topic Plaintiff had the burden on but largely ignores.

## 2. Official-Capacity § 1983 Claims

By suing Tabor and Harrell in their official capacities as to Counts I and II, McNally inculpates the Whitley County Sheriff's Department for Tabor's allegedly unlawful seizure/false arrest and his supposed use of excessive force. *See* DE 1 ¶¶ 4, 40–42. McNally faults "the utter lack of DUI detection and field sobriety training, the lack of any sort of mental health screening policy, and the total lack of supervision of deputies," as well as the county's lack of background and application investigation into prospective deputies. DE 44 at 10–11. Defendants argue that there was no constitutional violation and that, even if there were, McNally has not identified a policy or custom that served as the "moving force" behind the violation. DE 40-1 at 17. McNally responds that the county's failure to train and hiring practices are the requisite actionable policies. DE 44 at 6, 9–15.

Importantly, respondeat superior is not a basis for county liability under § 1983; rather, counties may be liable only for policies or customs that actually cause federal rights violations. *Thomas*, 398 F.3d at 429, 432–33. Under certain circumstances, both improper hiring practices and inadequate training may constitute "policies" actionable under § 1983. *Harris*, 109 S. Ct. at 1202–05; *Bd. of the Cty. Comm'rs v. Brown*, 117 S. Ct. 1382, 13 (1997) (assuming without deciding that "a single instance of inadequate screening could . . . trigger municipal liability"). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 117 S. Ct. at 1389, 1391 ("[A] court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."). Mere or even heightened negligence is insufficient. *Id.* at 1390.

A plaintiff who challenges hiring practices under § 1983 must show that "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Id.* at 1392. A failure-to-train theory fails unless a plaintiff shows "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *Harris*, 109 S. Ct. at 1205–06). Examples of deliberate indifference include "fail[ing] to provide adequate training in light of foreseeable consequences that could result from a lack of instruction" or failing to respond "to repeated complaints of constitutional violations." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

For the reasons discussed above, Tabor did not violate McNally's constitutional rights. But even if there were a constitutional violation, McNally has not proven the requisite link between the complained-of rights violations and the county's decisions about whether to hire and how to train and supervise Tabor. In *Brown*, the Supreme Court rejected municipal liability under § 1983 (on an excessive-force theory) for the county's decision to hire a particular deputy. *Brown*, 117 S. Ct. at 1393–94. The deputy's record reflected various misdemeanors, including assault and battery. *Id.* at 1392–93. Even though this record might have made the deputy a less-than-ideal candidate, there was no deliberate indifference in deciding to hire him. *Id.* at 1393. A full review of the deputy's record would not have alerted the sheriff to the fact that hiring the deputy would obviously lead to excessive-force violations. *Id.* Similarly, in this case, McNally complains that Harrell does not adequately verify an applicant's work history, which in Tabor's case would have revealed additional past employment as a law-enforcement officer and a previous excessive-force

complaint. DE 44 at 11–13. This does not rise to the level of deliberate indifference. It strains credulity to say that Harrell's remote decision "actually caused" McNally's injury—putting aside, of course, the unremarkable fact of but-for causation between all hiring decisions and all subsequent acts by employees. *See Brown*, 117 S. Ct. at 1391 ("Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a 'but-for' sense.").

Nor has McNally shown that Tabor's training was inadequate as a result of Harrell's deliberate indifference or that any alleged inadequacy had a sufficiently close connection to McNally's injury. For one, Tabor's training and qualifications are a centralized matter of state law: KRS 15.380(1)(c) requires that deputy sheriffs be certified by the Kentucky Law Enforcement Council. For another, none of the faults identified by McNally—lack of DUI-detection training, mental-health screening, or supervision—evinces deliberate indifference or a close causal connection to McNally's injury. For example, Tabor was familiar with some field-sobriety tests but not others. DE 31 at 20–48 (Tabor Deposition) (describing his DUI-detection training and stating that he would administer the one-leg stand and the walk-and-turn tests but not an HGN test because his training had not been refreshed recently). Had Harrell known about Tabor's rusty HGN-administration skills, it would not have been "plainly obvious" to Harrell that false arrest and excessive force were "highly likely" to result. *See Brown*, 117 S. Ct. at 1391. Put differently, Harrell need not have foreseen that Tabor's supposed skill deficits in DUI-detection would cause him to initiate a traffic stop and, without probable cause, perceive the need to forcefully seize a suspect for driving under the influence before having the opportunity to administer the field-sobriety tests with which he felt comfortable.

As far as mental-health screening, the court notes that "psychological suitability screening" is one of the minimal qualifications under Kentucky law. KRS 15.382. Harrell's failure to require

additional screening was neither deliberately indifferent nor closely related to the events that led to McNally's injury. Even Harrell's awareness of Tabor's diagnoses would not have put Harrell on notice that constitutional violations were highly likely to follow. Moreover, McNally engages in lay speculation when he asserts that Tabor's PTSD and hypervigilance contributed in any way to the takedown and arrest. *See* DE 44 at 16–20. This will not satisfy the "rigorous standards of culpability and causation" mandated by the Supreme Court. *See Brown*, 117 S. Ct. at 1389.

Finally, to the extent McNally cursorily mentions lack of supervision as an additional hook for county liability under § 1983, the analysis for inadequate supervision tracks the inquiry for inadequate training. *See Cabaniss v. City of Riverside*, 231 F. App'x 407, 416 (6th Cir. 2007). Again, McNally fails to demonstrate deliberate indifference. McNally does not explain why this incident was a "foreseeable consequence" of Harrell's lack of supervision over Tabor, nor does he reference or show "repeated complaints of constitutional violations" by Tabor. *See Brown*, 172 F.3d at 931.

For these reasons, summary judgment for Defendants is warranted on the official-capacity § 1983 claims. With no proven violations, up-the-chain liability is not available. For the alternative reasons explained, the hiring and oversight decisions of the Sheriff would (even with a constitutional claim) not support a culpability finding.

## C. State-Law Claims

### 1. Malicious Prosecution[7] (Count III)

---

[7] The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). "Such a claim encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). McNally does not characterize the malicious-prosecution count as an additional § 1983 theory. *See* DE 1 (identifying only Counts I and II as stemming from § 1983). The Court goes where the pleading leads.

### a. Individual-Capacity Claim Against Tabor

McNally alleges that Tabor maliciously instituted criminal charges against him. DE 1

¶¶ 64–67. Defendants counter that Tabor acted with probable cause and without malice. DE 40-1

at 29–30.

The Kentucky Supreme Court recently rearticulated the five elements of malicious

prosecution:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
> 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and
> 5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016).

It is unclear under Kentucky law "whether, in the context of multiple charges, the probable

cause element requires a malicious prosecution plaintiff to show that no probable cause existed on

any of the charges, and Kentucky courts have not addressed directly whether a finding of probable

cause on one charged offense precludes a malicious prosecution claim on the remaining charges."

*Smith v. Peyman*, 93 F. Supp. 3d 738, 750 (E.D. Ky. 2015). Without any determinative ruling from

the Kentucky Supreme Court, when multiple charges are at issue, federal courts in Kentucky

generally have analyzed probable cause as to each charge. *See id.*; *Martin v. Coyt*, No. 1:10-CV-

00176, 2013 WL 1187940, at *2–4 (W.D. Ky. Mar. 21, 2013); *Carter v. Porter*, No. 5:08-CV-246-

REW, 2011 WL 778408, at *7 (E.D. Ky. Mar. 1, 2011). *But see Hartman v. Thompson*, No. 3:16-

CV-00114-GNS-DW, 2018 WL 793440, at *15 & n.13 (W.D. Ky. Feb. 7, 2018) (noting that

simultaneous arrest on multiple charges has less potential to burden defendant through bail or

detention calculus), *aff'd*, 931 F.3d 471 (6th Cir. 2019). The Court follows the majority and analyzes probable cause as to each charge for purposes of the malicious-prosecution claim.

In this case, the parties contest only probable cause and malice. The probable-cause inquiry is substantially the same under federal and Kentucky law. *Williams v. Commonwealth*, 147 S.W.3d 1, 11–12 (Ky. 2004) (quoting *Beck v. Ohio*, 85 S. Ct. 223, 228 (1964); *Louisville & N. R. Co. v. Sharp*, 282 Ky. 758, 763 (Ky. Ct. App. 1940) (defining the term as "such ground as would induce a man of ordinary prudence to believe that the person prosecuted had committed the crime charged"). "[M]alice is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose." *Stearns Coal Co. v. Johnson*, 238 Ky. 247, 252 (Ky. 1931).

"The elements of malice and lack of probable cause are intertwined." *Meogrossi v. Aubrey*, 3:09cv-00301-JDM, 2011 WL 1235063, at *15 (W.D. Ky. Mar. 31, 2011). That is so because "malice may be inferred from a lack of probable cause." *Massey v. McKinley*, 690 S.W.2d 131, 133 (Ky. Ct. App. 1985).

> The jury, however, may not invariably imply malice from the mere want of probable cause if all the facts disclosed lead to a different conclusion. If malice was to be inferred from want of probable cause alone, then there would be no necessity for having a distinct requirement that malice be proven, for want of probable cause would then be the only element necessary to be established.

*Mosier v. McFarland*, 269 Ky. 214, 217 (Ky. 1937). In other words, lack of probable cause may support a finding of malice but is insufficient on its own and absent other supportive evidence.

Because the federal and Kentucky probable-cause standards are the same, the resolution of the § 1983 unlawful seizure/false arrest count partially determines the outcome on the malicious-prosecution count. For the reasons discussed above, Tabor had probable cause to charge McNally with no headlamps (a violation Plaintiff essentially concedes) and driving under the influence. McNally's malicious-prosecution theory necessarily fails as to these charges. As for the remaining

charges—no insurance and menacing—probable cause, as earlier analyzed, would be a triable issue. But Defendants are still entitled to summary judgment on this count because McNally cannot satisfy his burden of proving malice, a distinct required element of malicious prosecution. *See Martin*, 507 S.W.3d at 11–12.

McNally has not supported any malice argument with particular evidence that would suggest an evil or unlawful motive or purpose on Tabor's part. *See* DE 44 at 1 (containing a solitary use of the term "malice" and nowhere further developing a response to Defendants' argument); DE 40-1 at 30 (noting that McNally testified during his deposition that he did not know Tabor before this incident and that he had no reason to believe Tabor intended him harm); DE 30 at 34 (McNally Deposition). In *Scheffler v. Lee*, 752 F. App'x 239 (6th Cir. 2018), the Sixth Circuit found evidence of malice lacking when an officer had arrested the plaintiff for alcohol intoxication and disorderly conduct. *Id.* at 251–52. Though the plaintiff pointed to the officer's statement— apparently, "that 'we'll call it' alcohol intoxication"—the Sixth Circuit noted that the officer had witnessed the "erratic behavior" of the (now-plaintiff) defendant and that the defendant had refused to provide a urine sample. *Id.* Video evidence of the officer's demeanor and audio recordings further supported the lack of malice. *Id.* Here, a reasonable juror also could not draw an inference of malice from the record. There is nothing to suggest that Tabor had an improper purpose or justification for bringing no-insurance and menacing charges against McNally, given McNally's own account of the interaction. As Kentucky defines malice, Tabor would have had to pursue the charges with a purpose other than legitimate law enforcement. McNally may debate the merits of menacing or insurance status, but Plaintiff did not have proof of insurance on the borrowed vehicle at the time of the stop. Further, Tabor legitimately effected the DUI arrest and part of his focus was McNally's erratic conduct, refusal to follow directions, and effort to return, abruptly, to the

truck (where Tabor later found a large knife). Tabor was imperfect, perhaps, but nothing in the record suggests an improper motivation, or malice, in his decision-making as to pursuit of the insurance and menacing theories. As a result, Tabor has no individual-capacity liability on Count III.

### b. Qualified Official Immunity

The Court undertakes no qualified official immunity analysis because this defense does not apply to claims of malicious prosecution. The Sixth Circuit, interpreting Kentucky law, has noted that "there can be no qualified official immunity for a claim of malicious prosecution." *Clemons v. Couch*, 768 F. App'x 432, 438–39 (6th Cir. 2019); *Martin*, 507 S.W.3d at 5–6 ("[I]n the context of a malicious prosecution claim against state law enforcement officers, the issue of qualified official immunity is superfluous."). As its name reveals, malicious prosecution requires the plaintiff to prove malice, whereas the Kentucky defense of qualified official immunity applies when malice is not at play. *Martin*, 507 S.W.3d at 5–6.

### c. Official-Capacity Claim Against Harrell

Because Tabor has no primary liability for malicious prosecution, Harrell in his official capacity (in effect, the office or Whitley County) can have no liability on this count either. *See Haugh*, 242 S.W.3d at 687.

### 2. Battery (Count IV)

McNally claims that Tabor committed battery when he "offensively touched McNally" to effect his arrest and to handcuff him. DE 1 ¶¶ 71–73. Tabor avers that his use of force was privileged—and therefore not a battery—because the force appeared to be necessary to take McNally into custody and protect Tabor from harm. DE 40-1 at 31.

### a. Individual-Capacity Claim Against Tabor

Kentucky law defines battery as "any unlawful touching of the person of another" and requires only single intent; that is, the actor need only intend to make contact, not that the contact be harmful. *Vitale v. Henchey*, 24 S.W.3d 651, 657–58 (Ky. 2000) (internal quotation omitted). "However, Kentucky law partially shields police officers from liability for [battery]." *Tollison v. City of Independence*, No. 13-55-DLB-CJS, 2015 WL 5684030, at *12 (E.D. Ky. Sept. 25, 2015). "Under Kentucky law, an 'officer making an arrest may use such force as may be necessary to make the arrest but no more.'" *Hartman*, 931 F.3d at 486 (quoting *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. Ct. App. 1973); *see also* KRS 431.025(3) ("No unnecessary force or violence shall be used in making an arrest."); KRS 503.090(1) (providing that an officer may arrest by force when he "[b]elieves that such force is necessary to effect the arrest; . . . [m]akes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and . . . [b]elieves the arrest to be lawful").

A plaintiff's battery claim against a law-enforcement officer is likely to meet the officer's defense that the use of force was justified and therefore not a battery. In describing this situation, some courts have referred to non-justified force as "excessive force." For example, in *Dunn v. Felty*, 226 S.W.3d 68 (Ky. 2007), the Kentucky Supreme Court explained:

> In the context of an arrest, an officer is liable for excessive force in two circumstances: (1) he or she has reasonable grounds for making the arrest but used more force than was necessary; and (2) he or she only used necessary force in effecting the arrest but there were, in fact, no reasonable grounds for the arrest.

*Id.* at 74. But "excessive force" in this context seems to be a shorthand way of describing a defendant-officer's use of non-justified force. In other words, Kentucky courts' interpretations of "excessive force" in the context of an officer's alleged battery do not necessarily import the § 1983 excessive-force analysis. Despite the shared use of the term, the objective-reasonableness inquiry

under the Fourth Amendment does not precisely parallel the justified-force analysis under Kentucky law. *See Coitrone v. Murray*, 642 F. App'x 517, 524 (6th Cir. 2016) ("[T]he analysis of excessive force claims under § 1983 is different from the analysis under state law.") (internal quotation omitted). However, the Kentucky Court of Appeals once observed that "[c]onstitutional search-and-seizure jurisprudence provides similar substantive results." *Haugh*, 242 S.W.3d at 686.

In this case, McNally cannot succeed under either formulation described in *Dunn*: that Tabor used more force than was necessary or that Tabor lacked reasonable grounds for arrest. *Dunn*, 226 S.W.3d at 74. Finding that probable cause did exist for at least one arrestable offense forecloses the second theory. Qualified official immunity, discussed below, dooms the first.

### b. Qualified Official Immunity

"Qualified immunity applies when public officials perform (1) discretionary acts, (2) in good faith, and (3) within their scope of authority." *Hill v. Adkins*, 59 F. Supp. 3d 814, 820 (E.D. Ky. 2014) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). "If the act was discretionary and within the scope of authority, the burden shifts to the plaintiff 'to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.'" *Id.* (quoting *Yanero*, 65 S.W.3d at 523). Good faith "ha[s] both an objective and subjective aspect." *Yanero*, 65 S.W.3d at 523. The objective aspect amounts to objective unreasonableness whereas the subjective aspect involves willfulness, malicious intent, or a corrupt motive. *Id.*

Here, the dispute turns on whether McNally can demonstrate that Tabor did not act in good faith. Tabor undoubtedly acted within the scope of his authority when he arrested McNally, *see* KRS 431.005(1)(d), and the decision how to effect an arrest is a discretionary one, *see Estate of Collins v. Wilburn*, 755 F. App'x 550, 556 (6th Cir. 2018); *Castle v. Howard*, No. 5:11-CV-221-KSF, 2012 WL 3779123, at *8 (E.D. Ky. Aug. 31, 2012). In the context of McNally's

constitutional claims, the Court has already concluded that Tabor was not objectively unreasonable in his use of force. McNally does not identify record evidence that supports his allegation of Tabor's subjective bad faith, and viewing the record as a whole would not support an inference that Tabor displayed willfulness, malicious intent, or corrupt motive.

For the reasons discussed above, Tabor had reasonable grounds to arrest McNally, and qualified immunity protects his decision to use force to effect the arrest. As a result, McNally cannot succeed on Count IV against Tabor in his individual capacity.

### c. Official-Capacity Claim Against Harrell

Because the battery count against Tabor in his individual capacity fails, Harrell in his official capacity can have no liability on this count. *See Haugh*, 242 S.W.3d at 687.

### 3. Negligence/Gross Negligence (Count V)

### a. Individual-Capacity Claim Against Harrell

McNally claims that "Harrell had a legal duty to adequately train and supervise Sheriff's Department personnel in the administration of health care and policies." DE 1 ¶ 41. McNally further contends that Harrell breached his duty "to hire, train, and supervise Tabor and to take steps to prevent the violations herein" and "to ensure [Tabor's] conduct met the standard of ordinary law enforcement officers. *Id.* ¶¶ 80–81. McNally points to Harrell's "actual knowledge" that Tabor had inadequate DUI-detection and de-escalation training and that Tabor had violated unspecified Whitley County Sheriff's Office policies. *Id.* ¶¶ 43–45. Defendants argue that Harrell acted reasonably in relying on statutory certification requirements for law-enforcement officers and on Tabor's substantial law-enforcement experience. DE 40-1 at 34. Additionally, Defendants depend on qualified official immunity as a defense. *Id.* at 22–24.

Kentucky law recognizes the torts of negligent hiring, negligent retention, negligent supervision, and negligent training. *See MV Transp. Inc. v. Allgeier*, 433 S.W.3d 324, 336 n.10 (Ky. 2014) (collecting cases). "[A]n employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person." *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. Ct. App. 1998). "Kentucky conflates the negligent training and negligent supervision standards." *J.B.F. v. Ky. Dep't of Educ.*, No. 5:15-CV-33-REW, 2016 U.S. Dist. LEXIS 72419, at *48 (E.D. Ky. June 3, 2016); *see Booker v. GTE.net LLC*, 350 F.3d 515, 517–18 (6th Cir. 2003) (applying Kentucky negligent-supervision law); *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. Ct. App. 2013) (discussing knowledge of employment risk as relevant to both negligent training and supervision).

Here, for the reasons discussed in the context of the official-capacity § 1983 claims, McNally has not demonstrated that his injuries were foreseeable consequences of Harrell's decisions about hiring, training, and supervising Tabor. *Doe v. Magoffin Cty. Fiscal Court*, 174 F. App'x 962, 973–74 (6th Cir. 2006) ("Where there is no foreseeability, there is no duty under Kentucky law."). The causation chain is attenuated: McNally cannot show that Harrell should have foreseen that his decisions with respect to Tabor carried the risk of the violations of which McNally complains. For example, Tabor's faded familiarity with the HGN test is only marginally related to McNally's seizure. Tabor's facility with the HGN model would not have changed his calculus in deciding to arrest McNally by force, and McNally still would have faced charges arising out of this incident, even if Tabor had administered the HGN and even if McNally had passed with flying colors.[8]

---

[8] And again, with no underlying tort or misconduct by Tabor, Harrell's dependent liability is only an academic topic.

### b. Qualified Official Immunity

Even if McNally could demonstrate that Harrell's liability on this count presents a jury question, McNally has not overcome Defendants' defense of qualified official immunity. McNally does not dispute that Harrell acted within the scope of his authority. *See* DE 44 at 15–16. And, quintessentially, "[s]upervision and training are discretionary functions." *Nichols v. Bourbon Cty Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014). McNally does argue that Tabor's training was not discretionary because KRS 15.380 requires the employing agency to provide additional training to peace officers with specialized law enforcement responsibilities. DE 44 at 15–16; *see* KRS 15.380(3). However, McNally does not suggest—and the record does not support—that Tabor had such particular responsibilities. As with the battery claim, McNally bears the burden to demonstrate that Harrell did not act in good faith. Harrell's reliance on statutory minimum qualifications and training by the Kentucky Law Enforcement Council was not objectively unreasonable. Nor is there any indication of Harrell's subjective bad faith in the form of willfulness, malicious intent, or a corrupt motive.

## IV.  CONCLUSION

For the above reasons, the Court **GRANTS** DE 40 and will enter a separate Judgment.

This the 15th day of November, 2019.

Signed By:

*Robert E. Wier*

**United States District Judge**

36